IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America, ) | |
| ) | |
| Plaintiff, ) | Case No. 06 CR 860 |
| v. ) | |
| ) | Judge Virginia M. Kendall |
| Lorenzo Salgado, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

A Grand Jury charged Defendant Lorenzo Salgado ("Salgado") with knowingly and intentionally possessing with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 841(a)(1). Salgado moved to suppress the cocaine recovered from the basement and garage by Chicago Police Officer Earnest Cain ("Cain"), Chicago Police Officer Fernando Carvajal ("Carvajal"), Chicago Police Sergeant Armando Ramirez ("Ramirez") and Agent John Kennelly ("Kennelly") (collectively, the "officers") during a search of the house at 3417 North Keeler in Chicago, Illinois on November 17, 2005. Salgado also moved to suppress the statements he made at the time of his arrest on November 17, 2005. In his motion, Salgado claims that the officers forced entry into his home over the objection of both his sister, Yolanda Salgado ("Yolanda"), and his wife, Veronica Mendoza ("Mendoza"), and that they illegally searched the house and detached garage where they recovered the cocaine. Salgado claims that after the search, the officers forced Yolanda to sign a consent form that she did not understand because it was written in English. He further argues that Yolanda did not have authority to consent to a search because she did not live at the house. This Court heard testimony on the Motion on July 25 and 30, 2008 and August 5 and 18,

1

2008. For the reasons stated below, Salgado's Motion to Suppress is denied as to the cocaine found in the basement of the Keeler house and the cocaine found in the detached garage and granted as to his statement.

## FINDINGS OF FACT

On November 17, 2003, DEA officers were investigating Jose Arreola ("Arreola"), who was later arrested in Berwyn, Illinois where 223 kilograms of cocaine were seized from his residence. 226:16-17.[1] The officers observed Arreola travel to the Keeler house and pull up in a nearby alley. 212:12-24; 225:1-5. Another individual, later discovered to be Salgado, came out of the Keller house, took two duffel bags from the individual and brought them into the house. 212:12-24; 225:1-5. After Arreola was arrested on November 18, 2003, the officers proceeded to the Keeler house where they arrived around 10:30 pm. 288:6-8; 227:2-3; 264:5-6.

The parties dispute the facts surrounding the search at issue. Officers Carvajal, Ramirez and Cain and Agent Kennelly testified that they approached the Keeler house, and Carvajal knocked on the front door. 264:22-24; 323:7. When they approached the door, they noticed a security camera outside the house. 274:5-13; 402:15-19. A child, now known to be Jesus Salgado, answered the door, and Carvajal asked to speak to an adult. 265:14-16; 404:24. A woman, now known to be Mendoza, Salgado's wife, came to the door, and Ramirez told her in Spanish that he was a police officer conducting an investigation and he believed there was a chance there were drugs in the house. 265:21-266:6; 405:1-4. Carvajal asked if they could come in, and she said she did not know and that there was nobody there. 266:7-12.[2]

---

[1] This Court cites to the transcript of Salgado's suppression hearing as follows: Page Number: Line Numbers.

[2] Ramirez testified that she did not say anything. 405:21-23.

While Carvajal was speaking with Mendoza, Yolanda and her sister, Maria Salgado approached the house and asked the officers what they were doing there. 267:17-20; 289:13-14; 324:18-19; 405:24-406:21. Carvajal and Ramirez went to speak to the two women and told them in English that they were officers conducting an investigation and explained to them the danger of having drugs in a house including the risk of kidnaping. 267:21-268:11. Yolanda denied that there were any drugs in the house and told the officers that she owned the house and that she would let them in. 268:12-13; 305:17-23; 326:14-20; 406:4-6. Kennelly testified that in addition to saying she owned the house, Yolanda said she lived there. 325:11-13. Yolanda went up the stairs and spoke to Mendoza at the door in Spanish, and then the women let the officers in. 268:13-16; 326:23-327:10.[3]

Yolanda Salgado provided a different account. According to Yolanda, when she was parking near the Keeler house, she was approached by officers who asked her to identify herself and asked if she knew Salgado. 50:12-20. The officers represented to Yolanda that they were looking for Salgado because he was a suspect in a kidnaping. 50:14-15. The officers walked Yolanda and her sister, who was with her, to the house. 50:23-24. When they arrived at the house, Officer Carvajal asked Yolanda to open the door, and she repeatedly refused. 51:10-14.[4] She admitted that she owned the house, but said that she was renting it out. 51:12-13. Mendoza also refused to let the officers in, but they charged the door and entered the house. 52:6-11.

---

[3] Ramirez assumed that they had permission to enter the house because Carvajal turned to him and nodded and then proceeded to walk into the house. 407:3-6.

[4] Salgado's neighbor, Marco Salgado, testified that he saw Yolanda shaking her head, looking confused, 153:6-8, but based on the exhibits shown to the Court demonstrating his sight line on the situation, it appeared that Marco could not see any other potentially relevant activity.

The officers testified that upon entering the house, the officers spread out throughout the house to make sure that no other persons were hiding inside. 407:8-16. Ramirez stayed in the living room with the family. 407:8-16. Kennelly went upstairs where he found a child sitting on a bed watching television. 328:11-14. He looked in all the rooms but did not open any boxes or drawers. 363:23-363:4. Cain went to the basement where he observed a money counter, two duffle bags and a box containing brick-shaped items. 213:20-214:7. Meanwhile, the officers decided to get a consent to search. 407:19-408:2.

Within minutes, Cain and Ramirez brought Yolanda into the kitchen and gave her a consent to search form. 214:11-19; 215: 12-13. Cain explained the form to her in English and she appeared to understand. 215:3-7, 14-17; 216:4-8; 408:4-9. During this conversation, Yolanda again said she was the owner of the house and that she lived there with her brother. 215:23-24. She never said that she did not have keys or that she did not have authority to consent. 273:15-274:4. Yolanda denied any knowledge of the items in the basement and asked if she was going to be arrested if she signed the consent form. 216:14-20. Ramirez and Cain told her that she would not be arrested. 420: 22-25. Yolanda asked if she would be arrested if the officers got a search warrant, and Cain told her that it would not be within his control because a lieutenant, rather than the current sergeant, would then be in charge, and Cain could not speak for the lieutenant. 217:16-20. At first she did not want to sign the form, and she asked many questions about it, and Cain explained to her that if she did not, they would have to get a search warrant for the house. 217: 5-15; 408:11-15; 420:6-17. Yolanda never asked to have the form translated into Spanish. 247:22-248:11; 412:13-16. Regardless, a Spanish translation of the entire consent to search form was on the back of the form. 412:17-413:11. Within five minutes, Yolanda read and signed the consent form. 216: 21-24; 408:17-23.

4

After Yolanda signed the form, Cain returned to the basement and opened the duffle bags, where they found brick-shaped objects that appeared to be cocaine. 239:22-240:12. Kennelly began to search upstairs, where he found a handgun and two plastic bags containing large amounts of money in the master bedroom. 329:4-5. He spotted a trapdoor leading to an attic above the bed in the child's room, and when he climbed on the bed to reach it, he found that the mattress was strangely lumpy. 329:9-14. He called downstairs to Carvajal, and the two of them lifted the mattress to discover Salgado hiding beneath it. 329:16-330:5.

The officers handcuffed and patted down Salgado and brought him downstairs. 270:17-19; 330:12-17. At that time, the officers did not know who Salgado was. 271:6-7; 331:15-25; 411:11-17. When Cain emerged from the basement with the cocaine, Carvajal asked Salgado if he knew what it was.[5] 271:25-272:2; 331:3-9. In response, Salgado said, "You got my stuff. I have nothing to say. I want a lawyer." 272:2-4; 339:11-12. In asking that question, the officers intended to elicit who was the owner of the drugs. 355:14-17. At that point, Carvajal advised Salgado of his Miranda rights. 272:7-12. Carvajal and Kennelly acknowledged that Salgado was not free to leave when he made his statement. 313:21-22; 354:22-23.

In addition, during the search, Kennelly testified that he found several large pieces of luggage in the dining room of the house. Yolanda said they belonged to her and indicated that she had just come home from Mexico. 334:3-20. One of the bags contained personal documents with Yolanda's name on them. 335:5-6.

---

[5] Kennelly indicated that Salgado made his statement about fifteen to twenty minutes after he was handcuffed. 330:23.

Again, Yolanda's account differs. She testified that the police sat the family in the living room and she heard slamming around the house. 53:4-8. One of the officers then shouted that he found Salgado, and he was brought down the stairs in handcuffs. 55:23-56:3. The police then continued to look around the house, and an officer came up from the basement with some bags. 56:4-7. Yolanda further testified that after the police had been in the house for an hour, Cain and Ramirez brought Yolanda into the kitchen and asked her to sign a consent to search form. 56:20-57:19. She testified that she could not completely understand the form because it was in English, but was unable to identify what she could not understand. 88:19-22; 89:10-93:3. She testified that she told the officers she would like it translated into Spanish, but that they refused. 94:22-25; 8-11, although she had difficulty remembering whether she did or did not make this request during her live testimony. *See*, *e.g.*, 117:12-20. Yolanda stated that she told the officers that she did not want to sign the form, but that the officers said they could get a search warrant anyway and that she may be arrested if she did not sign the consent form.

It is uncontroverted that the officers found a detached garage behind the Keeler house and searched it and two vehicles contained therein. 332:4-6. The vehicles were not registered to anybody at the Keeler address. 332:11-13. Ramirez agreed that he and Cain did not inform Yolanda of their intention to search the garage when she signed the consent to search form. 420:3-5. Cain admitted that the officers never specifically asked Yolanda for permission to search the garage. 255:6-8. Indeed, the signed consent form specifically states that the officers were authorized to search "3417 N. Keeler (house)."

## DISCUSSION

Salgado argues 1) that the cocaine found in the house should be suppressed because Yolanda did not have the authority to consent to either the officers' entry or the search and that even if she did have authority, her consent was not effective; 2) that his statement should be suppressed because he was not properly advised of his rights; and 3) that the cocaine found in the garage should be suppressed because it was outside the scope of any possible consent to search.

**Authority to Consent**

A warrant less search of a home is not a violation of the Fourth Amendment if a person who possesses or who the officers reasonably believe to possess authority voluntarily consents to the search. *United States v. Groves*, 530 F.3d 506, 509 (7th Cir. 2008) *citing Georgia v. Randolph*, 547 U.S. 103, 106 (2006). Here, Yolanda voluntarily consented to both the officers' entry and the search and had both actual and apparent authority to do so.

Salgado argues that Yolanda did not have authority to consent to the officers' entry to or the search of the Keeler house, and therefore even if she did consent, such consent was ineffective. Here Yolanda had both actual and apparent authority to consent.

*Actual Authority*

The parties dispute Yolanda's relationship to the house. The officers testified that Yolanda told them that she lived at the Keeler house with her brother and his family. 215:23-24. Yolanda specifically told the officers that she had just returned home from Mexico, and her suitcases and travel documents were found at the Keeler house. *Id*.; 334:3-20.

At hearing, Yolanda admitted that she owned the house, but said that she was renting it out to Salgado and did not live there. 51:12-13. Several factors undermine Yolanda's credibility. First, it appears that Yolanda was a "nominee" owner of the house or at the very least, had a financial

relationship with Salgado that resulted in its purchase. Yolanda testified that at the time of the purchase, she was working as a waitress at El Gordo Mexican restaurant, and her husband was unemployed but receiving disability payments. 69: 10-18; 103:21-22. She testified that she made about $700 a week at the restaurant and her husband was receiving $1600-$1800 per month. 73: 5-7. The house cost $397,000. 70:8-9. Yolanda put $82,000 down and took out a mortgage for the rest. 70:15-20. The mortgage payments were about $2000 per month. Yolanda testified that she charged Salgado $1,700 in rent per month, although she left his fact out of her affidavit, which addressed the issues of the ownership and occupancy of the house. 83:17-22; 84:17-20. Marco Camarena, the owner of El Gordo Restaurant, testified at hearing. Although his records were minimal and listed Yolanda simply as "Yolanda", Camarena testified that he found Yolanda's name and employment dates in his records. 372:10-14; 375:2-3. According to those records, Yolanda worked at the restaurant as a waitress for only two weeks in February and March of 2002. 372:15-23; 374:15-16. At that time, he paid waitresses $180 per week, and they typically made about $150 per week in tips. 372:24-373:14.

Yolanda testified that she purchased the house at the beginning of 2005, while she was living in a rented apartment. 68:8-17. After she bought the house, she continued living at the apartment. 69:2-5. Yolanda averred that she did not buy the house for her brother to live in and did not move there simply because she could not get out of her lease. 71:16-72:10. However, she did not remain in the apartment for the full term of the lease. 74: 6-13. Also, Kennelly obtained the rental records for the lease, which stated that the lease began July 1, 2004 and ended June 30, 2005. 340:8-12. After leaving the apartment, Yolanda moved to Mexico, although she testified that she cannot remember when in 2005 she did so. 75:1-8.

8

The evidence shows that Yolanda could not and did not buy the house for her own purposes but rather appears to have a financial relationship that led her to testify in his favor. This Court finds that Yolanda's testimony was not credible and instead credits the officer's testimony that Yolanda told them that she owned the house and lived there with her brother, Salgado. As such, she, as well as Salgado, had authority to consent. *See*, *United States v. Aghedo*, 159 F.3d 308, 310 (7th cir. 1998) (common authority is based upon mutual use of property by persons generally having joint access or control) *citing United States v. Matlock*, 415 U.S. 164, 171 n. 7 (1974).

### *Apparent Authority*

Even if the Yolanda did not have actual authority to consent, her consent is effective if she had apparent authority. Such authority exists where "the facts available to an officer at the time of the search would allow a person of reasonable caution to believe that the consenting person had authority over the premises." *United States v. Ryerson*, No. 07-1654, 2008 WL 4248193, at *5 (7th Cir. September 18, 2008) (defendant's ex-wife had apparent authority even though she was locked out where defendant's agent let her in, personal effects remained in the home, and ex-wife demonstrated knowledge of the home) *citing Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990).

In determining whether apparent authority exists, the Court may consider : 1) possession of a key to the premises; 2) admission that a person lives at the premises; 3) possession of a driver's license listing the premises as the person's address; 4) receiving mail at the premises; 5) keeping clothing at the premises; 6) having one's children reside at the premises; 7) keeping personal belongings at the premises; 8) performing chores at the premises; 9) being on the lease or paying rent for the premises; and 10) being allowed into the premises when the owner is not present. *Groves*, 530 F.3d at 510. These factors are not a checklist or exhaustive list but rather show the

types of facts that warrant consideration in a determination of authority to consent. *Id*. Most of these factors do not apply in the reactive investigation at issue here - the officers were not in a position to thoroughly investigate Yolanda's relationship to the premises prior to seeking consent to search.

Here, the officers reasonably believed that Yolanda had authority to consent to a search. Yolanda told the officers outside the house without prompting that she was the owner of the house, affirmatively asserting her authority over the premises. *See*, *e.g.*, 268:12-13. Immediately thereafter, she spoke to Mendoza, who let the officers into the house, seemingly on Yolanda's authority. 268:13-16; 326:23-327:10. In addition, she told the officers that she lived in the house with her brother. *Id*. It is uncontroverted that neither Salgado nor Mendoza ever asserted that Yolanda could not consent to the search. Further, although not relevant to her apparent authority to consent to the officers' initial entry, rather than later asserting that she did not have authority to consent, Yolanda told the officers again before she signed the consent form that she was the owner of the house. 215:23-24. Given this situation, it was completely reasonable for the officers to believe that Yolanda had authority to consent, and her consent was effective because she had apparent authority.

**Consent to Enter the House**

This Court finds that Yolanda had authority to consent and consented to the officers' entry into the Keeler house, and if Mendoza did not consent, she at the very least stood silent and did not object. Yolanda testified that she and Mendoza repeatedly refused to let the officers into the house, but they charged the door, which was cracked open, to get it all the way open and enter the house. 51:10-14; 52:6-11. Again, however, Yolanda's testimony conflicts with that of the officers and is

10

not credible, and Mendoza did not testify. Jesus Salgado, Salgado's fifteen-year-old son, 169:9-16, also testified that the officers charged the door to enter the house. 52:6-11. However, Jesus's testimony was also incredible. On cross-examination, Jesus seemed to remember almost nothing about the incident or anything else. He did not know when his family left the Keeler address and moved to Mexico. *See*, *e.g.*, 193:6-7. He did not know if his father was in custody when he moved to Mexico. 194:21-24. He did not know how long the police were in his home before they took Yolanda into the kitchen. 199:6. He was unclear on whether or not he had spoken to any of his father's attorneys on just that past weekend. 200:23-202:6. After remembering that he was in the attorney's office this weekend, he could not remember which day, nor could he remember anything else he did that weekend. 205:14-15; 207:10-22. Therefore, this Court finds Yolanda and Jesus's testimony incredible.

If an individual with authority to consent either is not present to object or is present and does not object to consent given by another individual with authority, the consent is effective. *United States v. Henderson*, 536 F.3d 776, 780 (7th Cir. 2008). Since no person with authority was both present and objecting, the officers' entry into the house was proper.[6]

**Initial Protective Sweep**

Once they entered the Keeler house, the officers performed a cursory search of the premises. The Government argues that the original inspection performed by the officers upon their entrance into the Keeler house was not a full-blown search but rather a permissible protective sweep. Officers have an interest in ensuring their own safety when entering a dwelling, and as such may conduct a limited "protective sweep" in connection with an in-home arrest when they reasonably

---

[6] Salgado does not argue that this consent was involuntary.

11

believe based on "specific and articulable facts" that the area to be swept may harbor an individual that may pose a danger to the individuals present. *Maryland v. Buie*, 494 U.S. 325, 336 (1990); *United States v. Burrows*, 48 F.3d 1011, 1015 (7th Cir. 1995). A "protective sweep" is a "quick and limited search of the premises." *Id*.

The determination of whether a protective sweep was warranted is fact-specific, and the relevant facts should be considered in light of the policy considerations behind *Buie*. *Burrows*, 48 F.3d at 1016. This inquiry should focus on the configuration of the dwelling and the characteristic of those who are known to be present or may be present. *Id*.

The initial sweep performed by the officers upon entry was an acceptable protective sweep done for the important objective of protecting the officers' safety. First, as noted above, the officers entered the house with the Yolanda's permission and no resistance from Mendoza. 263:13-16; 326:23-327:10. They performed the sweep for the purposes of locating the individual who received the duffel bags the day before and of determining whether any other dangerous individuals were hiding in the house. 407:8-16. Thus, they entered the house to effectuate an arrest or at the very least for an analogous purpose - to locate a suspect.

The protective sweep was warranted and was not overly-intrusive. First, the officers could reasonably believe that individuals besides the two women they spoke to at the door could be present inside the house and that those individuals could be a threat to them. The officers went to the Keeler house because they had seen an individual recently arrested and found with 223 kilograms of cocaine hand off a duffel bag to a male at the house the day before. 212:8-24. Based on these facts, the officers reasonably believed that the house contained drugs and individuals involved in large scale drug trade. It was therefore reasonable for them to believe first, that there were other

occupants of the house, as they had not yet seen an adult male; and second, that those occupants were potentially involved in a large scale drug trade and therefore a potential danger to them. The presence of a security camera would indeed bolster any suspicion that any other individuals present in the house were indeed involved in drug trading with the previously arrested individual.

The area covered by the sweep was not too broad, that is, the officers were justified in sweeping the entire house. The officers had not been inside the house before nor had they extensively surveyed the house, and they were therefore unfamiliar with its layout and occupants. As such, they had no idea where potentially dangerous persons could be hiding or, for that matter, how many potentially dangerous persons could be hiding. This justified their security sweep of the entire house, including the upstairs and basement. *See United States v. Richards*, 937 F.2d 1287, 1291 (7th Cir. 1991) (fear of ambush more reasonable in an unknown setting). To this end, it is also noteworthy that the officers did not find the adult male target, later identified as Salgado, during the sweep. Therefore, having not yet found the suspected missing occupant, there did not come a point where the officers could reasonably conclude that they were out of danger and were thus obligated to stop their sweep

The officers initial inspection of the house also did not amount to a full-blown search rather than a permissible protective sweep. A "protective sweep" is "a quick and limited search of the premises" - not a full-blown search but rather a cursory inspection of places where a person could be found. *Buie*, 494 U.S. at 327. Here the officers made such a cursory inspection - they did not open any boxes or drawers. Kennelly testified that he looked in all the rooms upstairs but did not open any boxes, drawers, or the similar. 363:23-364:4. Notably, Agent Kennelly, who swept the second floor, saw the child sitting on the mattress under which Salgado was hiding but did not find

13

Salgado during the sweep. 328:11-14. Similarly, Cain spotted the duffle bags and other paraphernalia which was in plain view but testified credibly that he did not open the bags. 407:19-408:2.

Again, Yolanda offered conflicting testimony, stating that the officers searched the house for an hour prior to asking her to sign a consent to search form; but again, Yolanda's testimony in this matter is not credible. Not only was Yolanda motivated to provide her testimony through her familial connection, she was continually inconsistent in her factual responses and not plausible in her explanations. Salgado's son, Jesus Salgado, was unable to support Yolanda's testimony because he did not remember how long the officers searched the house before they brought Yolanda into the kitchen to sign the consent to search form. 199:6.

**Voluntariness of Consent**

As discussed above, Yolanda had both actual and apparent authority to consent to a search of the house. In order for Yolanda's consent to then search of the house to be valid, she must have voluntarily signed the consent to search form. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) Voluntariness of consent is a question of fact dependent on the totality of the circumstances, and the government bears the burden of proving voluntariness by a preponderance of the evidence. *See United States v. Sandoval-Vasquez*, 435 F.3d 739, 744 (7th Cir. 2006). In determining whether an individual's consent was given voluntarily, this Court considers: 1) the person's age, intelligence, and education; 2) whether she was advised of her constitutional rights; 3) how long she was detained before she consented; 4) whether consent was immediate or prompted by repeated requests; 5) whether physical coercion was used; and 6) whether the she was in police custody when she consented. *See Id*. citing *United States v. Santiago*, 428 F.3d 699, 704 (7th Cir. 2005).

Yolanda was able to and did understand the consent to search form. At hearing, she testified that she could not completely understand the form because it was in English. 88:19-22; 89:10-93:3. She further testified that she told the officers she would like it translated into Spanish, but that they refused. 94:22-25; 8-11.

Yolanda's testimony as to her confusion regarding the consent to search form was not credible. She admitted on the stand that she was able to ask for clarification, and during her testimony stated that "hereby" and "knowingly" were the only words in the consent to search form that she did not understand. 88:10-89:14. Even if she had any difficulty understanding the English form, a Spanish translation was available for her review on the opposite side of the form. 412:17-413:12. It is uncontroverted that she was not restrained when she signed the form nor was any physical coercion used. This Court further credits the officers' testimony that was not impeached that she gave her consent soon after the officers entered the house. 407:19-408:2; 214:11-19; 215:12-13.

Salgado further claims that Yolanda was coerced to sign the consent to search form. Yolanda stated that she told the officers that she did not want to sign the form, but that the officers said they could get an order to search anyway and they would arrest her if she did not sign. 58:13-16. However, the credible testimony of the officers shows that they did not threaten or in any way attempt to coerce Yolanda. With regard to the alleged threat of arrest, Yolanda asked the officers if she would be arrested if she signed the form, to which they said no. 420:22-25. She asked if she would be arrested if she did not sign the form, and Cain merely told her that they would then have to seek a search warrant and would no longer have control of the operation and thus could make no guarantees. 217:16-20. This does not amount to a threat of arrest.

15

Similarly, Cain and Ramirez did not attempt to coerce Yolanda with an empty threat of a search warrant. Police may not threaten to obtain a search warrant when there are not valid grounds for a warrant. *United States v. Evans*, 27 F.3d 1219, 1231 (7th Cir. 1994). Such an assertion that the officers will attempt to get a warrant if they do not receive consent does not render consent involuntary if the officers 1) had a subjective belief that there was probable cause to get a warrant and 2) they had a reasonable factual basis to believe they did in fact have probable cause and could therefore get a warrant. *United States v. Hicks*, 539 F.3d 566, 571-72 (7th Cir. 2008) (error where district court did not consider whether officer had a reasonable basis to believe there was probable cause).

Here, there is no evidence in the record to indicate that Cain and Ramirez were threatening to obtain a warrant as a pretext to gain consent. Indeed, it appears that they simply, in response to Yolanda's question, told her that they would attempt to get a warrant if she refused consent. Cain and Ramirez also could have reasonably believed that there was probable cause and thus they could get a search warrant because of the quantity of evidence of criminal activity they observed both during their surveillance the day before and during their initial sweep of the house.. Probable cause sufficient to support a search warrant exists when given the totality of the circumstances, "there is sufficient evidence to cause a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Robinson*, No. 07-4048, 2008 WL 4659369, at *3 (7 th Cir. October 23, 2008). When Cain told Yolanda that he would get a warrant if she did not consent, he was aware 1) that Arreola gave two duffel bags to another person who brought them into her house; and 2) that the duffel bags were in the basement along with a money counter, a seal-a-meal machine,

16

and a box containing brick-shaped items.[7] 212:12-24; 213:20-214:7; 225:1-5. This evidence is more than ample to cause a reasonable person to believe that a search of the house or even a search of the duffel bags will uncover further evidence of illegal drugs. As such, the officers assertion that they would get a warrant did not amount to an empty threat intended only to coerce Yolanda and her consent was voluntary. Because Yolanda, an individual with authority, voluntarily consented to the entry and search, the Motion to Suppress is denied as to the cocaine found inside the house.

**Suppression of Salgado's Statement**

Salgado argues that his statement made after the officers found him, "You got my stuff. I have nothing to say. I want a lawyer," should be suppressed because he was not properly advised of his rights before questioning by the officers. A person questioned by law enforcement after being taken into custody or significantly deprived of freedom must "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Stansbury v. California*, 511 U.S. 318, 322 (1994) *citing Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Any statements elicited in a manner noncompliant with this rule may not be used for certain purposes at criminal trial. *Stansbury*, 511 U.S. 322. However, the obligation to administer *Miranda* warnings only arises when an individual's freedom has been restricted to such an extent to render him "in custody." *Id. citing Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

Custody implies coercion and a situation where the individual knows he is speaking to a government agent and does not feel free to end the conversation. *United States v. Thompson*, 496

---

[7] This Court held above that the items in the basement were discovered as a result of a permissible protective sweep. As such, they may be considered in this determination of probable cause.

F.3d 807, 810 (7th Cir. 2007) *citing United States v. Salyers*, 160 F.3d 1152, 1159 (7th Cir. 1998). To determine whether Salgado was in effect in custody, this Court examines the totality of the circumstances to determine whether he was formally arrested or was subject to a restraint on his freedom of movement of a degree similar to a formal arrest. *Stansbury*, 511 U.S. at 322 *citing California v. Beheler*, 463 U.S. 1121, 1125 (1983). An individual is not in custody if a reasonable person in his situation would feel free to leave, and the Seventh Circuit requires district courts to make a determination of such "freedom to leave." *Thompson*, 496 F.3d at 810; *Salyers*, 160 F.3d 1159.

Here, Salgado was in custody when Carvajal asked him about the recovered cocaine. If not formally arrested when he made his statement, he was in a situation commensurate with arrest. Salgado had been taken from his hiding place by law enforcement officers, patted down, put in handcuffs, and transported to the lower floor of the house - a situation which is in differentiable from a formal arrest for *Miranda* purposes. 329:16-330:17; *See United States v. Smith*, 3 F.3d 1088, 1097-98 (defendant removed from his car, frisked, and handcuffed in the presence of multiple officers was in custody). He was not free to leave - he was in handcuffs. *See Salyers*, 160 F.3d at 1160 (specifically noting that defendant who was not in custody was never handcuffed or physically restrained); *United States v. Murray*, 89 F.3d 459, 462 (7th Cir. 1996) (defendant was in custody once he was handcuffed and officers announced he was under arrest). Indeed, in their testimony, Carvajal and Kennelly acknowledged that Salgado was not free to leave at that point. 313:21-22; 354:22-23.

When Salgado was in custody and before he was read his *Miranda* rights, Carvajal, intending to solicit a statement regarding who owned the cocaine, asked Salgado if he knew what the cocaine

18

taken from the basement was. 355:14-17. It was not until after Salgado answered the question that Carvajal advised him of his rights. 272:7-12. Therefore, Salgado was questioned by law enforcement while in custody without being read his *Miranda* rights as required by law, and his resultant statement, "You got my stuff. I have nothing to say. I want a lawyer," is suppressed.

**Consent to Search the Garage**

It is uncontraverted that in addition to searching the house, the officers searched a detached garage behind the Keeler house and the vehicles contained therein, where they found a quantity of cocaine. 332:4-6. Salgado argues that the cocaine the officers found in the Keeler house's detached garage should be suppressed even if Yolanda's consent to search was valid because the garage was outside the scope of her consent. Before reaching the issue of the scope of consent, this Court must first determine whether Salgado had an expectation of privacy in the garage and the vehicles contained therein. *United States v. Mendoza*, 438 F.3d 792, 796 (7th Cir. 2006) (case did not turn on whether unattached garage was within scope of consent but rather on whether defendant had expectation of privacy in garage). If Salgado does not have an expectation of privacy in the area searched, then his Fourth Amendment rights were not violated by the search. *Id*.

As the defendant objecting to the search, Salgado bears the burden of proving a legitimate expectation of privacy in the area searched - here, the garage and the cars contained therein. *Mendoza*, 438 F.3d at 795 *citing Rawlings v. Kentucky*, 449 U.S. 98 104 (1980). Salgado could establish such an expectation of privacy by showing that 1) he has an actual or subjective expectation of privacy in the area searched; and 2) his expectation is one that society recognizes as reasonable. *Mendoza*, 438 F.3d at 795 *citing Katz v. United States*, 389 U.S. 347, 361 (1967).

19

The record is devoid of evidence that Salgado had any privacy interest in the garage. To the contrary, it shows that neither of the vehicles found in the garage were registered to any of the persons present at the house at the time of the search and arrest. 332:4-13. Notably, neither Salgado nor Veronica testified as to either of their interest in the garage. *See United States v. Ruth*, 65 F.3d 599, 604-605 (7th Cir. 1995) ("without an affidavit or testimony from the defendant it is almost impossible to find a privacy interest because this interest depends, in part, on the defendant's subjective intent and his actions that manifest that intent"). Therefore, Salgado has not sustained his burden of establishing a privacy interest in the garage and the search by definition did not violate his rights. Salgado's Motion to Suppress the cocaine found in the detached garage is denied.

For the reasons stated above, Salgado's Motion to Suppress is denied as to the cocaine found in the basement of the Keeler house and the cocaine found in the detached garage behind the Keeler house; and granted as to his statement.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: November 18, 2008